# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

KATHLEEN CARTER,         )
            )
     **Plaintiff,**        )
            )
   **vs.**               )        **Case No. 1:05 CV 54 CAS (LMB)**
            )
JO ANNE B. BARNHART,     )
**Commissioner of Social Security,**   )
            )
     **Defendant.**       )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying Kathleen Carter's application for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income benefits under Title XVI of the Act.  The cause

was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b).  Plaintiff has filed a Brief in Support of

Complaint.  (Document Number 12).  Defendant has filed a Brief in Support of the Answer.

(Doc. No. 13).

## Procedural History

On August 1, 2003, plaintiff filed her application for Supplemental Security Income

benefits.[1]  On September 2, 2003, plaintiff filed her application for Disability Insurance Benefits,

---

[1]Plaintiff's application for Supplemental Security Income benefits was not included in the transcript.  (Tr. 3).

claiming that she became unable to work due to her disabling condition on March 31, 2001.[2]

(Tr. 52-54). Plaintiff's claims were denied initially, and following an administrative hearing,

plaintiff's claims were denied in a written opinion by an Administrative Law Judge (ALJ), dated

July 30, 2004. (Tr. 34-39, 12-19). Plaintiff then filed a request for review of the ALJ's decision

with the Appeals Council of the Social Security Administration (SSA). (Tr. 9-11). The Appeals

Council denied plaintiff's request to review the ALJ's decision on February 18, 2005, after

considering additional evidence. (Tr. 5-8). Thus, the decision of the ALJ stands as the final

decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on July 15, 2004. (Tr. 316). Plaintiff was

present and was represented by counsel. (Id.). The ALJ began by admitting a number of exhibits

into the record. (Tr. 317). The ALJ then summarized the facts surrounding plaintiff's

applications for benefits. (Tr. 318). The ALJ stated that plaintiff alleges that she has been

disabled since March of 2001. (Id.). The ALJ stated that plaintiff's application for benefits was

denied at the field office level because it was thought that plaintiff could work in spite of her

alleged impairments. (Id.). The ALJ stated that plaintiff then filed a request for a hearing. (Id.).

The ALJ informed plaintiff that a vocational expert was present for questioning. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she is 45 years of age and

has a ninth grade education. (Tr. 319). Plaintiff stated that she can read and write, although she

---

[2]Plaintiff filed a prior application for benefits under Title II, which was denied after an administrative hearing on July 23, 2003. (Tr. 80).

cannot comprehend very well. (Id.). Plaintiff testified that she cannot comprehend newspaper articles when they use difficult words. (Id.). Plaintiff stated that she cannot keep a checkbook. (Id.). Plaintiff testified that she is married and that she lives in a house with her husband and her two sons. (Id.). Plaintiff stated that she has not received any vocational training. (Id.). Plaintiff testified that she is five-feet-two-inches tall, weighs about 145 pounds, and is right-handed. (Tr. 320). Plaintiff stated that she receives Medicaid benefits. (Id.).

Plaintiff testified that she worked very little in the fifteen years prior to the hearing. (Id.). Plaintiff stated that she worked at Basler Electric, where she placed bobbins on a machine and lifted boxes. (Id.). Plaintiff testified that she also worked at Current River Home Health and Current River Nursing Home. (Id.). Plaintiff stated that she did not remember the dates that she worked at any of these positions. (Tr. 320-21). Plaintiff testified that she washed dishes for clients when she worked for Current River Home Health. (Tr. 321).

The ALJ next questioned plaintiff, who testified that her home health work was part-time. (Id.). Plaintiff stated that she worked at Rowe Industries in 1999 and earned $12,400. (Id.). Plaintiff testified that she worked at Rowe Industries, which is a furniture factory, for about six months. (Id.). Plaintiff stated that this position involved sewing covers for couches while sitting down. (Id.). Plaintiff testified that at Basler Electric, she lifted boxes up and placed plastic bobbins weighing 30 to 50 pounds on a machine. (Tr. 322). Plaintiff stated that she was on her feet all the time at this position, and that she worked there for at least six months. (Id.). Plaintiff testified that the home health care job was a part-time position. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she experiences epileptic seizures, which prevent her from working. (Tr. 323). Plaintiff stated that brain surgery provided

some relief from the seizures, although she still experiences shaking episodes, which are accompanied by a loss of balance and vision. (Id.). Plaintiff testified that her seizures became worse in 2003 and that she started going back to the doctor fairly often at this time. (Id.). Plaintiff stated that she has experienced migraines frequently since undergoing brain surgery. (Tr. 324). Plaintiff testified that she has carpal tunnel syndrome[3] in the left and right arm, joint arthritis,[4] and severe back pain. (Id.). Plaintiff stated that she also has short-term and long-term memory loss. (Id.). Plaintiff testified that an MRI[5] revealed the presence of a tumor located between her eyes. (Id.). Plaintiff stated that she has been experiencing pain in her joints daily for the last two years. (Id.). Plaintiff testified that she experiences constant pain that she rates as a 7 or 8 on a scale of 1 to 10 in her shoulder, neck, hipbone, backbone, knees, and ankles. (Tr. 325). Plaintiff stated that when she stands she becomes dizzy and when she walks the joints in her back around her pelvis begin to hurt. (Id.). Plaintiff testified that she cannot sit for long periods without experiencing pain. (Id.). Plaintiff stated that the medication she takes provides very little relief. (Id.). Plaintiff testified that the pain she experiences would prevent her from working. (Id.).

Plaintiff stated that she can only walk seven to eight feet before she loses her balance and falls. (Tr. 325-26). Plaintiff testified that she can sit for 15 to 20 minutes before she has to stand due to pain. (Tr. 326). Plaintiff stated that she can stand about 15 to 20 minutes before she has

[3]The most common nerve entrapment, characterized by nocturnal hand paresthesia and pain, and sometimes sensory loss and wasting in the median hand distribution. Stedman's Medical Dictionary, 1749 (27th Ed. 2000).

[4]Inflammation of a joint. See Stedman's at 149.

[5]Abbreviation for magnetic resonance imaging. Stedman's at 1135.

to sit down.  (Id.).  Plaintiff testified that she experiences pain in her pelvis, back, and ankles when she is standing and when she is sitting.  (Id.).  Plaintiff stated that she can bend over and touch her knees very slowly.  (Id.).  Plaintiff testified that she can lift and carry no more than five pounds without dropping the object.  (Tr. 326-27).  Plaintiff stated that she can carry a bag of groceries only if it is very light.  (Tr. 327).  Plaintiff testified that she experiences difficulty pushing and pulling because she has "pulled muscles," and because she cannot grip due to the carpal tunnel syndrome.  (Id.).  Plaintiff stated that she has carpal tunnel syndrome in her right and left hand and that she has been treated for this impairment by a doctor at Washington University in St. Louis. (Id.).  Plaintiff testified that she also sees Rosemary Claus-Gray, a mental health professional. (Id.).

Plaintiff stated that she wakes up between 4:00 a.m. and 8:00 a.m. and that she goes to bed between 10:00 p.m. and 12:00 a.m.  (Tr. 328).  Plaintiff testified that she spends her days sitting down and looking at magazines.  (Id.).  Plaintiff stated that she used to enjoy sewing but she can no longer sew.  (Id.).  Plaintiff testified that she does not have any other hobbies that she enjoys.  (Id.).  Plaintiff stated that she sees a counselor once a week and that she attends church. (Id.).  Plaintiff testified that when she sits too long at church she has to get up and walk around. (Tr. 328-29).  Plaintiff stated that her husband helps her with her personal needs, including washing and shaving her legs.  (Tr. 329).  Plaintiff testified that she experiences difficulty breathing due to different medications she takes and because she smokes.  (Id.).  Plaintiff stated that her sinuses bother her, and that the medication she takes for her sinuses causes her to become drowsy.  (Id.).  Plaintiff testified that she become dizzy when she is in the heat for prolonged periods and that the left side of her head hurts when she is in the cold.  (Tr. 329-30).

The ALJ then examined plaintiff, who testified that she has seen Dr. Lawrence Eisenman for her seizures. (Tr. 330). Plaintiff stated that she has not gone to the hospital or emergency room for her seizure condition in the year prior to the hearing. (Id.). The ALJ noted that plaintiff's doctor stated that plaintiff's seizures were controlled for ten years following surgery, but they have reoccurred. (Id.). The ALJ stated that, in other words, plaintiff's pituitary gland[6] is somewhat growing. (Id.). The ALJ stated that plaintiff experiences simple partial seizures without alteration of consciousness, which do not require seizure precautions at this time. (Id.). The ALJ noted that plaintiff's doctor found that plaintiff would benefit from resuming an anti-epileptic medication, and that he placed plaintiff on Neurontin.[7] (Id.). Plaintiff testified that the Neurontin helped her condition. (Tr. 331). Plaintiff stated that she does not lose consciousness when she experiences seizures. (Id.). Plaintiff testified that an MRI revealed a pituitary tumor, which her doctors are watching but they are not recommending surgery at this time. (Id.).

Plaintiff testified that she frequently sees a social worker at Samuel Medical Clinic. (Id.). Plaintiff stated that she takes anti-depressants. (Tr. 332). Plaintiff testified that she underwent surgery in 1992 for her carpal tunnel syndrome and that her doctors are not recommending surgery at this time. (Id.). Plaintiff stated that she has not been hospitalized for a psychiatric problem. (Id.). Plaintiff testified that her husband and two sons perform most of the housework. (Id.). Plaintiff stated that she folds clothes while sitting down. (Id.). Plaintiff testified that she does not cook. (Id.). Plaintiff stated that she goes to the grocery store with her husband.

---

[6]An unpaired compound gland suspended from the base of the hypothalamus by a short extension of the infundibulum. See Stedman's at 746.

[7]Neurontin is indicated for the treatment of partial seizures. See Physician's Desk Reference (PDR), 2590 (59th Ed. 2005).

(Tr. 333).  Plaintiff testified that the only other place she goes is to church.  (Id.).  Plaintiff stated that she is usually unable to work in the yard.  (Id.).  Plaintiff testified that she drives to the store, to church, and to her counseling sessions.  (Id.).  Plaintiff stated that she can only stand 10 to 15 minutes before having to sit down.  (Id.).  Plaintiff testified that she could only stand, walk, or sit a total of one hour in an eight-hour period.  (Tr. 334).  Plaintiff stated that the maximum amount of weight she can lift is five pounds.  (Id.).

The ALJ next examined the vocational expert, Randi Hetrick.  (Id.).  The ALJ stated that plaintiff testified that she worked at a furniture factory sewing couches and that she worked in an electric company placing bobbins that weighed 30 to 40 pounds on machinery.  (Tr. 335).  The ALJ stated that these jobs appear to be substantial gainful activity.  (Id.).  The ALJ then stated that plaintiff testified that she worked part-time as a nurse's aide, or home care person.  (Id.). The ALJ instructed plaintiff to describe her position at the furniture factory.  (Tr. 336).  Plaintiff testified that she operated a sewing machine at this position.  (Id.).  Plaintiff stated that she did not lift any more than 20 pounds at this job, although she was asked to try to lift more than 20 pounds.  (Tr. 336-37).  The vocational expert classified this job as light work.  (Tr. 337).  The vocational expert described plaintiff's job at the electric company as production line assembler, which she classified as light work.  (Id.).  The ALJ noted that because plaintiff lifted more than 30 pounds at this job, the job was medium work as she performed it.  (Id.).

The ALJ then asked the vocational expert to assume a claimant who is 45 years old with a ninth grade education; capable of performing medium work with mild pain; who can occasionally climb, balance, stoop, kneel, crouch, and crawl; should avoid heights and moving machinery; and has mild to moderate mental limitations for understanding and remembering tasks, sustaining

concentration, persistence, or social interacting with the general public, and adapting to work places changes. (Tr. 337-38). The vocational expert responded that plaintiff could not perform the sewing job because that position required significant concentration, persistence, and pace. (Tr. 339). The vocational expert testified that plaintiff could perform her production line assembly job if she were limited to medium or light work but not if she were limited to sedentary work. (Id.). The vocational expert stated that plaintiff could not perform the production line assembly job if she had marked limitations in her mental functions. (Tr. 340).

The vocational expert testified that plaintiff could perform other entry-level jobs at the medium level with the restrictions of avoiding heights and moving machinery, and mild to moderate mental limitations. (Id.). The vocational expert testified that plaintiff could work as a hand packager, and that 2,200 of these jobs exist in Missouri and 99,000 exist nationally. (Id.). The vocational expert stated that plaintiff could work as an assembler of large parts, and that 3,000 of these jobs exist in Missouri and 150,000 exist nationally. (Id.). The vocational expert testified that plaintiff could also perform light jobs, such as production inspector occupations. (Tr. 340-41). The vocational expert stated that 900 of these jobs exist in Missouri and 80,000 exist nationally. (Tr. 341). The vocational expert testified that plaintiff could also work as a housekeeper, and that approximately 1,200 of these jobs exist in Missouri and 111,000 exist nationally. (Id.). The vocational expert stated that plaintiff could not perform this job if she were markedly limited in mental functions. (Id.).

Plaintiff's attorney indicated that she did not have any questions for the vocational expert. (Tr. 342). The ALJ then asked plaintiff if she had any additional comments. (Tr. 342). Plaintiff stated that she becomes aggravated because she cannot comprehend. (Id.). The ALJ noted that

plaintiff had already provided this information.  (Id.).

**B.    Relevant Medical Records**

The record reveals that plaintiff presented to Barnes Hospital on April 9, 1984, for

evaluation of abdominal pain and a possible seizure disorder.  (Tr. 111-12).  Plaintiff was

diagnosed with temporal lobe seizures and depression.  (Tr. 112).

Plaintiff underwent right carpal tunnel release surgery on January 22, 1993.  (Tr. 107-08).

It was noted that plaintiff tolerated the procedure well.  (Tr. 108).

Plaintiff underwent an EEG[8] on January 25, 1993, which revealed findings consistent with

the presence of clinical seizures.  (Tr. 109).  Plaintiff also underwent an MRI of the head on this

date, which revealed the presence of a pituitary adenoma.[9]  (Tr. 110).

In a report dated January 26, 1998, neurologist Shahid K. Choudhary, M.D. indicated that

plaintiff had been experiencing seizures since she was two years old.  (Tr. 216).  Dr. Choudhary

stated that plaintiff tried various medications but continued to have frequent seizures.  (Id.).  Dr.

Choudhary indicated that plaintiff underwent brain surgery at Barnes Hospital in 1993.  (Id.).  Dr.

Choudhary stated that plaintiff reported only mild seizures with no passing out spells in the prior

one year period.  (Id.).  Dr. Choudhary noted that plaintiff believes her carpal tunnel syndrome

symptoms have not improved since her carpal tunnel release surgery.  (Id.).  Dr. Choudhary stated

that plaintiff also reports feeling depressed for the past seven to eight years and that she is being

_____

[8]Electroencephalography (EEG) is the registration of the electrical potentials recorded by
an electroencephalograph.  See Stedman's at 575.

[9]A benign neoplasm of the pituitary generally arising in the anterior pituitary gland.  See
Stedman's at 24-25.

treated with Prozac.[10]  (Id.).  Dr. Choudhary noted that plaintiff appeared depressed and cried

during most of the examination.  (Tr. 217).  Upon physical examination, Dr. Choudhary found

that plaintiff had no spinal tenderness or swelling of the joints, and her gait was normal.

(Tr. 218).  Dr. Choudhary found that plaintiff's grip strength was decreased.  (Id.).  Dr.

Choudhary's impression was: (1) seizures that are mild, with no loss of consciousness; (2) carpal

tunnel syndrome bilaterally, with no significant improvement since surgery and weakness of her

grips bilaterally; and (3) depression, which is causing more problems than anything else.

(Tr. 219).  Dr. Choudhary recommended that plaintiff be evaluated and treated by a psychiatrist.

(Id.).

Plaintiff was referred to Al L. Nagy, M.D. for a psychiatric evaluation on March 6, 1998.

(Tr. 224).  Plaintiff complained of depression that had been present since the early 1990s.  (Id.).

Dr. Nagy stated that plaintiff was being treated with Prozac.  (Id.).  Dr. Nagy noted that plaintiff's

mood reflected significant depression, feelings of hopelessness, and low self-esteem.  (Tr. 226).

Dr. Nagy found no evidence of psychotic disorganization, psychotic confusion, hallucinations,

suicidal ideas, or homicidal thoughts.  (Id.).  Dr. Nagy's impression was major depression,[11] with

---

[10]Prozac is indicated for the treatment of major depressive disorder.  See PDR at 1874.

[11]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and
appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Diagnostic criteria
for a major depressive episode include a depressed mood, a marked reduction of interest or
pleasure in virtually all activities, or both, lasting for at least 2 weeks.  In addition, 3 or more of
the following must be present: gain or loss of weight, increased or decreased sleep, increased or
decreased level of psychomotor activity, fatigue, feelings of guilt or worthlessness, diminished
ability to concentrate, and recurring thoughts of death or suicide.  Stedman's at 478.

a Global Assessment of Functioning (GAF)[12] score of 51.[13]  (Id.).

Plaintiff saw Gilbert D. Smith, M.D., on November 22, 2002, February 13, 2003, June 12, 2003, July 1, 2003, July 25, 2003, and September 15, 2003, for various complaints.  (Tr. 234-39). On November 22, 2002, Dr. Smith diagnosed plaintiff with depression and prescribed Paxil.[14] (Tr. 239).  Plaintiff began reporting arthritis pain in her left side and right shoulder on June 12, 2003.  (Tr. 237).  Dr. Smith also noted that plaintiff was depressed on this date, and prescribed Lexapro.[15]  (Id.).  On July 1, 2003, plaintiff complained of pain in her joints and a tingling pain. (Tr. 236).  Dr. Smith diagnosed plaintiff with fibromyalgia.[16]  (Id.).  Dr. Smith continued to diagnose plaintiff with depression and fibromyalgia on July 25, 2003, and on September 15, 2003. (Tr. 234-35).

Dr. Smith completed a Residual Functional Capacity Questionnaire on April 18, 2003. (Tr. 231-33).  Dr. Smith expressed the opinion that plaintiff could sit eight hours, stand four hours, walk two hours, and work six hours.  (Tr. 231).  Dr. Smith stated that plaintiff could

---

[12]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[13]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[14]Paxil is indicated for the treatment of major depressive disorder.  See PDR at 1586.

[15]Lexapro is indicated for the treatment of major depressive disorder.  See PDR at 1282.

[16]A syndrome of chronic pain of musculoskeletal origin but uncertain cause.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as an axial distribution; additionally, there must be point tenderness in at least 11 of 18 specified sites.  See Stedman's at 671.

continuously lift or carry up to 10 pounds, frequently lift or carry 11-20 pounds, occasionally lift or carry 21-50 pounds, and never lift or carry 51-100 pounds. (Id.). Dr. Smith found that plaintiff could use her hands and feet for repetitive movements. (Tr. 232). Dr. Smith stated that plaintiff could frequently bend, reach above, stoop, and kneel; occasionally swat and crouch; and never crawl or climb. (Id.). Finally, Dr. Smith found that plaintiff could frequently tolerate being around moving machinery, exposure to marked temperature changes, driving automotive equipment, exposure to dust, fumes and gases, and exposure to noise; but could not tolerate exposure to unprotected heights. (Tr. 233).

Plaintiff presented to Dr. K.Y. Bennett at the request of Disability Determinations on May 21, 2003, for a psychological evaluation. (Tr. 249). Dr. Bennett found that plaintiff appeared to be experiencing an anxious and depressed mood, which was severe. (Tr. 253). Dr. Bennett stated that plaintiff was oriented to person, place, time, and purpose and was not psychotic. (Id.). Dr. Bennett noted that plaintiff denied suicidal or homicidal ideation, yet she stated that she has had suicidal ideation approximately twice in the prior year. (Id.). Dr. Bennett found that plaintiff was functioning in the low average to borderline intellectual functioning range. (Id.). Dr. Bennett's diagnostic impression was: major depressive disorder, recurrent, severe without interepisode recovery, superimposed on dysthymic disorder;[17] dysthymic disorder early onset; and

---

[17]A chronic disturbance of mood characterized by mild depression or loss of interest in usual activities. Stedman's at 526.

generalized anxiety disorder.[18]  (Tr. 256).  Dr. Bennett assessed a GAF of 38.[19]  (Id.).

Dr. Bennett also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on May 21, 2003.  (Tr. 247-48).  Dr. Bennett expressed the opinion that plaintiff had a moderate restriction in her ability to understand and remember short, simple instructions; carry out short, simple instructions; and make judgments on simple work-related decisions.  (Tr. 247).  Dr. Bennett stated that plaintiff had a marked limitation in her ability to understand and remember detailed instructions and carry out detailed instructions.  (Id.).  Dr. Bennett found that plaintiff had a slight restriction in her ability to interact appropriately with the public, supervisors and co-workers; a slight restriction in her ability to respond appropriately to changes in a routine work setting; and a moderate restriction in her ability to respond appropriately to work pressures in a usual work setting.  (Tr. 248).  Dr. Bennett also noted that plaintiff's memory and thinking were affected by her impairments.  (Id.).  Dr. Bennett expressed the opinion that plaintiff could not manage benefits in her own best interest.  (Id.).

Jerry L. Kinder, M.D., a non-examining state agency medical consultant, completed a Physical Residual Functional Capacity Assessment on October 2, 2003.  (Tr. 258-65).  Dr. Kinder expressed the opinion that plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk about 6 hours in an 8-hour day, sit about 6 hours in an 8-hour

---

[18]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features.  Stedman's at 526.

[19]A GAF score of 31 to 40 denotes "[s]ome impairments in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up other children, is defiant at home, and is failing at school)."  DSM-IV at 32.

workday, and push or pull an unlimited amount of time.  (Tr. 259).  Dr. Kinder found that had no

postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 260-62).

On October 22, 2003, John O. Wood, Psy.D., examined plaintiff at the request of

Disability Determinations.  (Tr. 266).  Dr. Wood found that plaintiff exhibited a moderate degree

of depression.  (Tr. 269).  Dr. Wood stated that plaintiff appears to be chronically depressed and

may be evidencing a dysthymic disorder.  (Id.).  Dr. Wood noted that plaintiff reported a history

of depression that is related to her seizure disorder and may also be related to the sexual and

physical abuse that she experienced as a child.  (Id.).  Dr. Wood's diagnostic impression was:

major depressive disorder, recurrent; and generalized anxiety disorder.  (Id.).  Dr. Wood assessed

a GAF of 45-50.[20]  (Id.).  Dr. Wood noted that plaintiff appeared to be capable of understanding

and following simple instructions, although she had problems with memory.  (Tr. 270).  Dr. Wood

also stated that plaintiff's ability to sustain concentration and maintain persistence on simple tasks

was adequate.  (Id.).  Dr. Wood stated that plaintiff's ability to interact socially in a one-to-one

structured setting was fair.  (Id.).  Finally, Dr. Wood found that plaintiff should be capable of

managing some of her own finances, although he noted that plaintiff stated that she is unable to

manage her own finances.  (Id.).  Dr. Wood recommended that plaintiff continue to receive

psychiatric treatment for the indefinite future.  (Id.).

Plaintiff underwent an MRI of the brain on November 4, 2003.  (Tr. 271).  The impression

of the reviewing physician, Kenneth McVey, D.O., was: enlarged pituitary gland, which may be

---

[20]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

due to a macroadenoma[21] as well as other pituitary lesions; and postoperative changes with the absence of a portion of the anterior aspect of the left temporal lobe. (Id.). Dr. McVey recommended a neurosurgical consult for further evaluation of the enlarged pituitary gland. (Id.).

On November 10, 2003, a non-examining state agency consultant, Joan Singer, Ph.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 275-77). Dr. Singer expressed the opinion that plaintiff's ability to carry out detailed instructions was markedly limited; plaintiff's ability to understand and remember detailed instructions, maintain attention and conversations for extended periods, work in coordination with others without being distracted by them, complete a normal workday and workweek without interruptions for psychologically based symptoms, and perform at a consistent pace were moderately limited; and plaintiff's ability to remember locations and work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, and make simple work-related decisions were not significantly limited. (Tr. 275). Dr. Singer found that plaintiff's ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others were moderately limited; and plaintiff's ability to ask simple questions or request assistance, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public

---

[21]A pituitary adenoma larger than 10 mm in diameter.  Stedman's at 1050.

transportation were not significantly limited.  (Tr. 276).  Dr. Singer commented that plaintiff is capable of performing simple, 1-2 step tasks on a routine basis but requires a relatively low-stress work setting with minimal public contact.  (Tr. 277).  Dr. Singer also completed a Psychiatric Review Technique, in which she stated that plaintiff is moderately limited in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence or pace.  (Tr. 289).

The record reveals that plaintiff saw Rosemary Claus-Gray, LCSW, for counseling seven times from December 2002 to September 2003.  (Tr. 297, 299).  Ms. Claus-Gray noted that plaintiff expressed suicidal thoughts during her sessions on December 24, 2002, January 9, 2003, August 13, 2003, and September 9, 2003.  (Tr. 297, 299).

On December 4, 2003, Ms. Claus-Gray completed a Mental Medical Source Statement. (Tr. 293-94).  Ms. Claus-Gray expressed the opinion that plaintiff was extremely limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted; complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independent of others.  (Id.).  Ms. Claus-Gray found that plaintiff was markedly limited in her ability to remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out detailed instructions; make simple work-related decisions; interact appropriately with

the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Id.). Finally, Ms. Claus-Gray found that plaintiff was moderately limited in her ability to carry out very short and simple instructions; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Id.).

On December 29, 2003, plaintiff presented to Lawrence Eisenman, M.D., of the Washington University Adult Epilepsy Center for evaluation of possibly recurrent seizures and a pituitary mass. (Tr. 304). Dr. Eisenman noted that plaintiff's seizures were controlled for ten years following a left temporal lobe resection and have now recurred. (Tr. 305). Plaintiff complained of tingling in her left arm that moved up to the left side of the body and caused a sensation in her stomach that felt like a punch. (Tr. 304). Dr. Eisenman described plaintiff's seizures as simple partial seizures without alteration of awareness. (Id.). Dr. Eisenman stated that seizure precautions are not required at this time, although plaintiff would benefit from resuming an antiepileptic medication. (Id.). Dr. Eisenman prescribed Neurontin, referred plaintiff to Endocrinology for evaluation of her pituitary tumor, and scheduled an MRI. (Id.).

Dr. Smith completed another physical Medical Source Statement on January 20, 2004. (Tr. 228-29). Dr. Smith expressed the opinion that plaintiff could frequently lift 25 pounds, occasionally lift 25 pounds, stand or walk continuously for 3 hours, stand or walk with breaks 7 hours in an 8-hour workday, sit continuously for 6 to 8 hours, and sit with usual breaks for 8 hours in an 8-hour workday. (Tr. 228). Dr. Smith stated that plaintiff could occasionally climb and crawl, and could frequently balance, stoop, kneel, crouch, reach, handle, finger, feel, see,

hear, and speak.  (Tr. 229).  Dr. Smith found that there was no need for plaintiff to lie down or recline to alleviate symptoms during an 8-hour workday, and that plaintiff's medications do not produce side effects that cause any limitations.  (Id.).

Plaintiff underwent an MRI of the brain on March 29, 2004, which revealed a mass that was described as a possible pituitary adenoma.  (Tr. 310).

On September 7, 2004, plaintiff underwent CT[22] scans of the lumbar[23] spine, whole body, and knees bilaterally.  (Tr. 312-14).  The CT scan of plaintiff's lumbar spine revealed probable mild disc bulging at L5[24]-S1[25] and mild degenerative arthritis.[26]  (Tr. 312).  The CT scan of plaintiff's whole body revealed abnormal increased activity in the lateral aspect of the distal right femur.  (Tr. 313).  The CT scan of plaintiff's knees revealed an ill defined sclerotic[27] lesion

---

[22]Abbreviation for computed tomography.  Stedman's at 433.

[23]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[24]Abbreviation for lumbar vertebrae (L1 to L5).  Stedman's at 956.

[25]Abbreviation for sacral vertebrae (S1 to S5).  Stedman's at 1586.

[26]Degenerative arthritis, or osteoarthritis, is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result.  See Stedman's at 1282.

[27]Hardening of nervous and other structures by a hyperplasia of the interstitial fibrous or glial connective tissue.  See Stedman's at 1604.

involving the lateral distal right femur.  (Tr. 314).  It was noted that benign[28] versus malignant[29]

bone lesion should be differentiated.  (Id.).  The left knee survey was unremarkable.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant meets the nondisability requirements for a period of disability and
        Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act
        and is insured for benefits through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset
        of disability.

3.      The claimant's depression and myalgia are considered "severe" based on the
        requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.      These medically determinable impairments do not meet or medically equal one of
        the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding her limitations are not
        totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the following residual functional capacity: medium exertion-level
        work, or work involving lifting 50 pounds occasionally, 25 pounds frequently (20
        CFR §§ 404.1567, 416.967).  Furthermore, the claimant can no more than
        occasionally change postures and must avoid hazardous machinery and
        unprotected heights.  She is mildly-to moderately-limited in all areas of mental
        functioning.

7.      The claimant retains the capacity to perform her past relevant work as a
        production line assembler, as advised by vocational expert.

8.      The claimant was not under a "disability," as defined in the Social Security Act, at
        any time through the date of this decision (20 CFR §§ 404.1520(g) and
        416.920(g)).

---

[28]Denoting the mild character of an illness or the nonmalignant character of a neoplasm.
Stedman's at 196.

[29]Having the property of locally invasive and destructive growth and metastasis.
Stedman's at 1058.

(Tr. 18-19).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based on the application
> protectively filed on September 2, 2003, the claimant is not entitled to a period of
> disability and Disability Insurance Benefits, under Sections 216(I) and 223, respectively, of
> the Social Security Act.

> It is the further decision of the Administrative Law Judge that, based on the application
> protectively filed on August 1, 2003, the claimant is not eligible for Supplemental Security
> Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 19).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).   The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878

(8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.     The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant

has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th

Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful

employment." If the claimant is, disability benefits must be denied. See

20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant

suffers from a medically severe impairment or combination of impairments. See

20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly

limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education

and work experience of a claimant are not considered in making the "severity" determination. See

id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. <u>See</u> <u>id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. <u>See</u> <u>id.</u> Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. <u>See</u> <u>id.</u> Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),

416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956

F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

C.    **Plaintiff's Claims on Appeal**

Plaintiff raises two claims on appeal of the Commissioner's decision.  Plaintiff first argues that the ALJ erred in assessing plaintiff's residual functional capacity.  Plaintiff next argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible. The undersigned will address each claim in turn, beginning with the ALJ's credibility determination.

1.    **Credibility Determination**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff specifically argues that the ALJ erred by not properly considering the Polaski factors in making his determination.  Defendant contends that the ALJ properly assessed plaintiff's credibility and discounted plaintiff's subjective complaints due to inconsistencies in the record.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies,

and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing. 739 F.2d at 1322. In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996). It is well-established that in disability determinations, credibility assessments are left to the ALJ and not the courts. This court cannot "disturb the decision of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain." Browning v. Sullivan, 958 F.2d 817, 821-22 (8th Cir. 1992).

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is not supported by substantial evidence in the record as a whole. The credibility factors indicated by the ALJ are either not dispositive in themselves or are analyzed incorrectly. For instance, the ALJ first discussed plaintiff's daily activities. The ALJ points to plaintiff's testimony that she spends her days going to the grocery store, driving her car for short distances, folding clothes, and going to church. The Eighth Circuit has repeatedly held that "the ability to do activities such as light housework and visiting with friends provides little or

no support for the finding that a claimant can perform full-time competitive work." Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998) (quoting Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996)). See also Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work"); Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir. 1990) ("[A] claimant's ability to perform household chores does not necessarily prove that claimant is capable of full-time employment").

In this case, plaintiff testified that she only drives to the grocery store, to church, and to her counseling sessions, and that her husband always accompanies her. (Tr. 333). Plaintiff testified that she cannot sit for very long at church, and that she must get up and walk to the restroom during the service to relieve her pain. (Tr. 328-29). Plaintiff testified that she can no longer sew and that she has no other hobbies. (Tr. 328). Plaintiff stated that she folds clothes while sitting down. (Tr. 332). Plaintiff additionally testified that her husband and two sons perform most of the housework and her husband helps her with her personal needs, including washing and shaving her legs. (Tr. 329, 332). These activities are not indicative of plaintiff's ability to sustain full-time work, nor are they inconsistent with plaintiff's complaints of pain and limitations. For these reasons, the ALJ's reliance on these activities in discrediting plaintiff's complaints was erroneous.

The ALJ also points to a lack of objective medical findings as detracting from the credibility of plaintiff's complaints. The objective medical evidence, however, does not support a finding that plaintiff's subjective complaints are not credible. The ALJ first discussed plaintiff's mental impairments. The ALJ stated that consulting psychologist Dr. Wood found that plaintiff was alert and oriented; had a slightly slowed speech rate and a normal tone; had a normal fund of

knowledge; had a normal memory; had adequate concentration, calculation, abstraction, insight, and judgment. (Tr. 16). The ALJ's summary of Dr. Wood's report does not accurately represent Dr. Wood's findings. Dr. Wood found that plaintiff's expression was flat, and her mood depressed; plaintiff became tearful during the evaluation; plaintiff appeared apprehensive during the evaluation; plaintiff was oriented to date, year, month, day, and place; plaintiff had no difficulty with the immediate recall task but could not recall any of the three words she had been asked to remember on the delayed recall task; plaintiff was unable to do serial sevens, although she was able to spell the word "world" backwards; a slowness of pace was noted; and no delusions, hallucinations, or homicidal or suicidal thoughts were present. (Tr. 269). Dr. Wood diagnosed plaintiff with recurrent major depressive disorder and generalized anxiety disorder, and assessed a GAF score of 45-50. (Id.). Dr. Wood summarized that plaintiff may be chronically depressed and may be evidencing a dysthymic disorder, possibly related to the sexual and physical abuse that she experienced as a child. (Id.). Dr. Wood recommended that plaintiff obtain psychiatric treatment for the indefinite future. (Id.). Dr. Wood also noted that plaintiff evidenced some problems with memory, although her ability to sustain concentration and maintain persistence on simple tasks was adequate. (Tr. 270). These findings do not discredit plaintiff's subjective complaints in any way.

The ALJ also stated with regard to Dr. Wood's report that the result of plaintiff's F-Scale test showed signs of malingering. (Tr. 16). The record reveals that Dr. Wood did not administer this test. It was the report of Dr. Bennett that contained test results indicative of malingering. (Tr. 254). Dr. Bennett, however, did not express the opinion that plaintiff was malingering. Rather, Dr. Bennett diagnosed plaintiff with severe major depressive disorder, dysthymic disorder,

and generalized anxiety disorder, and assessed a GAF score of 38. (Tr. 256). Dr. Bennett also noted that plaintiff demonstrated an ability to understand and follow only simple instructions, and that she did not appear to be capable of withstanding pressures of work or managing her funds. (Tr. 253). Dr. Bennett also noted that plaintiff's memory functions were impaired, the quality of her thinking was impoverished, and plaintiff's social judgment skills were mildly impaired. (Tr. 254). The ALJ did not mention Dr. Bennett's findings in his decision.

The ALJ next discussed the findings of the non-examining state agency psychologist, Joan Singer. The ALJ stated that Dr. Singer found that plaintiff had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of extended decompensation. (Tr. 16). The ALJ did not mention, however, that Dr. Singer found that plaintiff's ability to carry out detailed instructions was markedly limited. (Tr. 275). Dr. Singer's findings do not discredit plaintiff's allegations of a disabling mental impairment in any way.

With regard to plaintiff's physical impairments, the ALJ stated that plaintiff's seizures were cured by brain surgery, plaintiff's diagnosis of fibromyalgia is no longer noted in plaintiff's treatment notes, and plaintiff has not complained of carpal tunnel syndrome since her 1992 surgery. (Tr. 17). The medical record, however, contains recent diagnoses of both seizures and fibromyalgia. Plaintiff began complaining of tingling pain in her left arm to her treating physician, Dr. Smith, in July 2003. (Tr. 236). Plaintiff was referred to Dr. Eisenman at the Washington University Adult Epilepsy Center by G. Samuel, M.D. on December 29, 2003, for evaluation of possibly recurrent seizures and a pituitary mass. (Tr. 304). Dr. Eisenman stated that plaintiff reported that she began experiencing seizures about a year prior to her visit, after a ten-year

period of controlled seizures. (Tr. 304). Dr. Eisenman diagnosed plaintiff with partial seizures without alteration of awareness, prescribed Neurontin, and referred plaintiff to Endocrinology. (Tr. 305). An MRI performed on March 29, 2004 revealed the presence of a suprasellar mass. (Tr. 310). Dr. Smith diagnosed plaintiff with fibromyalgia on July 1, 2003. (Tr. 236). A diagnosis of fibromyalgia was also noted on plaintiff's subsequent visits to Dr. Smith on July 25, 2003, and on September 15, 2003. (Tr. 234-35).

In sum, the undersigned recognizes that each Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). However, the administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). In this case, the ALJ has not given sufficiently "good reasons" for discounting plaintiff's subjective complaints of pain and limitations.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the Commissioner in order for the ALJ to more fully evaluate plaintiff's complaints under the standards set out in Polaski.

### 2.     Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Specifically, plaintiff contends that the ALJ failed to properly evaluate the medical opinion evidence under the standards contained in Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), and Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Respondent argues that the ALJ's residual functional capacity determination is well-supported by the record.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be contrasted with the axiom that "[the opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh, 222 F.3d at 452 (quoting Kelley, 133 F.3d at 589). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). However, such opinions do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148.

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). However, an ALJ is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir.

1998). If the opinion of a treating physician is not well supported or is inconsistent with other

evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of

examination, (2) the nature and extent of the treatment relationship, including the treatment

provided and the kind of examination or testing performed, (3) the degree to which the

physician's opinion is supported by the relevant evidence, (4) consistency between the opinion

and the record as a whole, (5) whether or not the physician is a specialist in the area upon which

an opinion is rendered, and (6) other factors which may contradict or support the opinion. See

Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6)(2002).

Plaintiff first argues that the ALJ improperly assigned little weight to the opinion of

plaintiff's counselor, Rosemary Claus-Gray. Defendant contends that Ms. Claus-Gray is not an

"acceptable medical source," and that the evidence from acceptable medical sources contradict

Ms. Claus-Gray's assessment. Ms. Claus-Gray expressed the opinion that plaintiff was extremely

limited in her ability to maintain attention and concentration for extended periods; perform

activities within a schedule; maintain regular attendance, and be punctual within customary

tolerances; sustain an ordinary routine without special supervision; work in coordination with or

proximity to others without being distracted; complete a normal workday without interruptions

from psychologically based symptoms and to perform at a consistent pace; be aware of normal

hazards and take appropriate precautions; travel in unfamiliar places or use public transportation;

and set realistic goals or make plans independent of others.  (Id.).  Ms. Claus-Gray found that

plaintiff was markedly limited in her ability to remember locations and work-like procedures;

understand and remember very short and simple instructions; understand and remember very short

and simple instructions; understand and remember detailed instructions; carry out detailed

instructions; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Id.). Finally, Ms. Claus-Gray found that plaintiff was moderately limited in her ability to carry out very short and simple instructions; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Id.). In his decision, the ALJ acknowledges the opinion of Ms. Claus-Grays that plaintiff has marked or severe limitations in 17 of 20 mental function areas, yet states that if plaintiff "were truly so limited, another treating physician, examiner, Disability Field Officer, or even myself, during the hearing, would have noticed and made note of it." (Tr. 17).

The undersigned finds that the ALJ erred in discounting the opinion of Ms. Claus-Gray. Although defendant is correct in stating that Ms. Claus-Gray is not an "acceptable medical source" for purposes of 20 C.F.R. § 404.1513(a), as a licensed clinical social worker, Ms. Claus-Gray fits the criteria of an "other" medical source. As such, Ms. Claus-Gray is a an appropriate source of evidence regarding the severity of plaintiff's impairment, and the effect of the impairment on plaintiff's ability to work. See 20 C.F.R. § 404.1513(d)(1). Ms. Claus-Gray saw plaintiff on seven occasions over a period of nine months. (Tr. 297-99). Ms. Claus-Gray noted that plaintiff exhibited depression and that plaintiff expressed suicidal thoughts during several of her counseling sessions. (Tr. 297-99). As such, Ms. Claus-Gray's findings are supported by her own records.

Further, the opinion of Ms. Claus-Gray is consistent with the findings of the other medical

sources contained in the record. Plaintiff's treating physician, Dr. Smith, diagnosed plaintiff with depression and prescribed Paxil and Lexapro. (Tr. 234-39). Dr. Nagy, who evaluated plaintiff in March of 1998, diagnosed plaintiff with major depression and assessed a GAF of 51. (Tr. 226). Dr. Bennett, an examining clinical psychologist, diagnosed plaintiff with severe recurrent major depressive disorder, superimposed on dysthymic disorder; early onset dysthymic disorder; and generalized anxiety disorder. (Tr. 256). Dr. Bennett assessed a GAF of 38. (Id.). Dr. Bennett expressed the opinion that plaintiff had a marked limitation in her ability to understand and remember detailed instructions and carry out detailed instructions, and the remainder of plaintiff's mental functions were either moderately or slightly limited. (Tr. 247-48). Dr. Wood, another examining clinical psychologist, diagnosed plaintiff with recurrent major depressive disorder and generalized anxiety disorder, and assessed a GAF of 45-50. (Tr. 269). Dr. Wood found that plaintiff was capable of understanding and following simple instructions, although she experienced problems with memory. (Tr. 270). Finally, Joan Singer, Ph.D., a non-examining state agency consultant, expressed the opinion that plaintiff's ability to carry out detailed instructions was markedly limited, while plaintiff's other mental functions were either moderately limited or not significantly limited. (Tr. 275-77). Dr. Singer concluded that plaintiff is capable of performing simple, 1-2 step tasks on a routine basis but requires a relatively low-stress works setting with minimal public contact. (Tr. 277).

The objective medical record is not inconsistent with Ms. Claus-Gray's assessment that plaintiff's depression causes marked and severe limitations in the majority of mental function areas. Every medical source contained in the record expressed the opinion that plaintiff was markedly limited in at least one mental function area. Even Dr. Choudhary, a neurologist, noted

in a report dated January 26, 1998, that plaintiff was depressed and cried during most of the examination. (Tr. 217). Further, the GAF scores assessed by the examining sources support the presence of marked and severe limitations in mental functioning. Dr. Bennett assessed a GAF score of 38 and Dr. Wood assessed a GAF score of 45 to 50. A GAF score of 30 to 40 denotes major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood, while a score of 40 to 50 denotes serious symptoms or any serious impairment in social, occupational or school functioning.[30]

After rejecting Ms. Claus-Gray's assessment, the ALJ concluded that plaintiff was only mildly-to-moderately impaired in all mental function areas. (Tr. 17). Ms. Claus-Gray had an established examining relationship with plaintiff after seeing plaintiff for seven counseling sessions over a period of nine months. As such, the ALJ should have accorded greater weight to her assessment that plaintiff's depression causes marked and severe limitations in the majority of mental function areas. Ms. Claus-Gray's assessment was consistent with her counseling notes and with the opinions of the other medical sources. This is particularly relevant because the vocational expert, Randi Hetrick, testified that plaintiff could not perform any of her past work or other jobs mentioned during the hearing if she had marked limitations in her mental functions. (Tr. 340-41). Thus, the ALJ erred in rejecting Ms. Claus-Gray's opinion and concluding that plaintiff was only mildly-to-moderately impaired in all mental function areas.

With regard to plaintiff's physical impairments, the ALJ acknowledged that plaintiff's treating physician, Dr. Smith, expressed the opinion that plaintiff is capable of light exertion work with no more than occasional postural changes. (Tr. 17). The ALJ, however, states that these

---

[30]See DSM-IV at 32.

limitations appear to be based upon plaintiff's subjective complaints of pain. (Id.). The ALJ stated that he was not granting these assessments great evidentiary weight, as they are not consistent with Dr. Smith's own treatment records. (Id.). The ALJ cited the opinion of a state agency physician that plaintiff is capable of performing a full range of medium work activities. (Id.). The ALJ thus adopted this residual functional capacity assessment, with the added restriction that plaintiff is limited to no more than occasional postural changes and must not be exposed to hazardous machinery or unprotected heights. (Id.).

In his most recent Medical Source Statement, dated January 20, 2004, Dr. Smith expressed the opinion that plaintiff could frequently lift 25 pounds, occasionally lift 25 pounds, stand or walk continuously for 3 hours, stand or walk with breaks 7 hours in an 8-hour workday, sit continuously for 6 to 8 hours, sit with usual breaks for 8 hours in an 8-hour workday. (Tr. 228). Dr. Smith further found that plaintiff could occasionally climb and crawl, and could frequently balance, stoop, kneel, crouch, reach, handle, finger, feel, see, hear, and speak. (Tr. 229). According to Dr. Smith's assessment, plaintiff is capable of performing light, but not medium work, as medium work involves lifting up to 50 pounds occasionally and 25 pounds frequently. See 20 C.F.R. § 404.1567(c). Although the ALJ found that Dr. Smith's assessment was not consistent with Dr. Smith's own treatment notes, the ALJ failed to set out any inconsistencies. Dr. Smith's treatment notes reveal that plaintiff consistently complained of joint pain, resulting in a diagnosis of fibromyalgia. Dr. Smith's opinion regarding plaintiff's functional limitations is consistent with his treatment notes. As such, the ALJ should have accorded more weight to his opinion, as plaintiff's treating physician.

The only medical evidence supportive of the ALJ's physical residual functional capacity

assessment is the assessment of the non-examining state agency medical consultant, Dr. Kinder. Dr. Kinder expressed the opinion, based upon a review of the medical record, that plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk about 6 hours in an 8-hour day, sit about 6 hours in an 8-hour workday, and push or pull an unlimited amount of time. (Tr. 259). The opinion of a consulting physician who examines the claimant once or not at all generally does not constitute substantial evidence. See Singh, 222 F.3d at 452; Kelley, 133 F.3d at 589. Thus, the ALJ assessed a physical residual functional capacity that is unsupported by the record.

In conclusion, the ALJ assessed a residual functional capacity that is not supported by substantial evidence. The ALJ erred in discounting the opinion of plaintiff's therapist, Ms. Claus-Gray, in determining plaintiff's mental residual functional capacity. Ms. Claus-Gray's assessment, along with the assessments of the other mental health professionals, is indicative of much greater restriction than the mental residual functional capacity formulated by the ALJ. The ALJ also erred in discounting the opinion of plaintiff's treating physician, Dr. Smith, and relying solely on the opinion of the non-examining consulting physician, in assessing plaintiff's physical residual functional capacity. As such, the ALJ's residual functional capacity determination fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

Accordingly, the undersigned recommends that this matter be reversed and remanded back to the Commissioner in order for the ALJ to accord the proper weight to the medical opinions contained in the record regarding plaintiff's physical and mental limitations, and to formulate plaintiff's residual functional capacity therefrom. In light of the findings of marked and severe

limitations in various areas of mental functioning, and the low GAF scores assessed by the various mental health professionals, the ALJ should consider whether plaintiff's mental impairments meet or equal a listing. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

## <u>RECOMMENDATION</u>

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation and further that the court not retain jurisdiction of this matter.

The parties are advised that they have eleven (11) days, until August 25, 2006, to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this __14th__ day of August, 2006.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE